Justice DURHAM,
opinion of the Court:
INTRODUCTION
€ 1 Wade John Miles was convicted under Utah Code section 76-10-5083 (2011)[1] for having a pocketknife among his personal belongings, which he carried with him in a shopping cart. Section 76-10-5083 of the Utah Code criminalizes, among other things, possession of a "dangerous weapon" by a restricted person. The term "dangerous weapon," in turn, is defined in subsection 76-10-501(6). Mr. Miles appealed his conviction, arguing that his pocketknife did not qualify as a dangerous weapon under that statutory definition. He first argued that the statute permits consideration only of a knife's actual use, not its intended use. He then argued that because Salt Lake City failed to proffer evidence that the knife was *214 actually used, the evidence presented at trial was insufficient to establish that his knife was a "dangerous weapon." The court of appeals rejected Mr. Miles's interpretation of the statute and held that an object's intended use may always be considered in determining whether the object is a "dangerous weapon" as defined by statute. Salt Lake City v. Miles, 2013 UT App 77, ¶ 13, 299 P.3d 1163. Under this reading, the court held that the evidence presented at trial, including, importantly, Mr. Miles's verbal threats to kill someone with a knife, was sufficient to establish that the knife in Mr. Miles's shopping cart was a dangerous weapon. Id. ¶19.
2 We granted certiorari to determine two issues: first, whether the court of appeals correctly interpreted the statutory definition of "dangerous weapon" in subsection 76-10-501(6); and second, whether the jury had sufficient evidence to reasonably conclude that Mr. Miles's knife qualified as a "dangerous weapon" under that statute. We disagree with the court of appeals that the statute permits consideration of an item's intended use if the item is "a knife, or another item ... not commonly known as a dangerous weapon." Utah Code § 76-10-501(6)(b). For those objects, we hold that the statute permits consideration only of how the object was actually used, as outlined by the factors in subsection 76-10-501(6)(b). Based upon this interpretation of the statute, we hold that the evidence presented at trial was insufficient to establish that the pocketknife lying in Mr. Miles's shopping cart was a dangerous weapon as defined by statute.
BACKGROUND
18 On the evening of October 4, 2011, Mr. Miles, who was homeless, attempted to board a light rail train in downtown Salt Lake City. The train operator prevented Mr. Miles from entering the train because Mr. Miles was attempting to board with a shopping cart containing his personal possessions. The train operator also believed Mr. Miles was intoxicated, so he radioed for assistance from the field supervisor on patrol that night. The supervisor arrived soon thereafter and found Mr. Miles sitting on a decorative rock on the train platform. Mr. Miles's shopping cart was located beside him. The supervisor asked Mr. Miles to move with him to the sidewalk for safety reasons, but Mr. Miles refused and became "vulgar and belligerent" toward the supervisor. The supervisor then informed Mr. Miles that if he did not calm down, the supervisor would need to call the police for help in removing Mr. Miles from the platform. In response, Mr. Miles, still sitting on the rock, made a statement about a knife and a gun, which was the subject of some conflicting evidence at trial. Shortly after the incident, the supervisor wrote in his witness statement that Mr. Miles said "if" he had a gun or a knife he would "shoot and kill" the supervisor if the supervisor did not get away from Mr. Miles. At trial, however, the supervisor testified that Mr. Miles said he did have a knife and a gun and that-here the supervisor couldn't recall, but he believed-Mr. Miles said he would either stab or shoot him.
14 A police officer arrived a few minutes later and handcuffed Mr. Miles as a safety precaution. The officer asked Mr. Miles if he had a weapon, and Mr. Miles replied that he did not. At this point the officer "felt that [Mr. Miles] gave [him] a straight answer," so he proceeded to administer a field sobriety test, which Mr. Miles failed. Based upon the officer's observations to this point, he arrested Mr. Miles for intoxication, threatening the supervisor, and trespass.
15 The officer next conducted a search incident to arrest. After finding "nothing of any significance" on Mr. Miles's person, the officer searched Mr. Miles's shopping cart. There, the officer found a folding pocketknife inside the left breast pocket of one of Mr. Miles's jackets. Mr. Miles was not wearing the jacket during the incident on the train platform. When the officer inquired about the knife, Mr. Miles said he forgot he had it, but that he had purchased the knife for a dollar at Wal-Mart and used it for camping. The knife's blade is approximately three-and-a-half inches long and has a one-inch serrated portion next to the handle. The blade also features a thumb stud, which allows the user to rotate the blade open with one hand. Onee rotated open, the blade locks back into a position parallel with the handle to prevent *215 the blade from swinging closed on the user's fingers. To close the blade from this locked position, the user must press the "safety switch" located along the top edge of the knife handle. At trial, the police officer testified that the knife was capable of causing "exaggerated" wounds, permanent disfigurement, or death, if used as a weapon. The officer agreed, however, that the "knife wouldn't inflict injury unless a person was intending to use it [as a weapon]." Moreover, the officer stated that the knife could be used as a tool for a variety of lawful purposes.
T6 Salt Lake City ultimately charged Mr. Miles with four crimes: (1) eriminal trespass; (2) threats against life or property; (8) intoxication; and (4) purchase, transfer, possession, or use of a dangerous weapon by a restricted person.[2] The jury acquitted Mr. Miles of the first three charges but convicted him of the fourth-possession of a dangerous weapon by a restricted person. Mr. Miles timely appealed to the Utah Court of Appeals, claiming the evidence presented at trial was "insufficient to establish that the knife he possessed on the train platform was a dangerous weapon as defined by statute." Salt Lake City v. Miles, 2013 UT App 77, ¶ 9, 299 P.3d 1163. Over Judge Davis's dissent, a majority of the court affirmed Mr. Miles's conviction. Id. ¶ 21.
T7 The court first addressed the parties' disagreement over how to interpret the statute defining "dangerous weapon." UraH Cope § 76-10-501(6). That statute begins in subsection 76-10-501(6)(a) by stating that the term "dangerous weapon" means "an item that in the manner of its use or intended use is capable of causing death or serious bodily injury." However, the statute's next subsection-subsection 501(6)(b)-sets out four factors that must be used to determine whether a knife, specifically, is a dangerous weapon:
The following factors shall be used in determining whether a knife, or another item, object, or thing not commonly known as a dangerous weapon is a dangerous weapon:
(1) the character of the instrument, object, or thing;
(ii) the character of the wound produced, if any;
(iii) the manner in which the ihstrument, object, or thing was used; and
(iv) the other lawful purposes for which the instrument, object, or thing may be used.
Id. § 76-10-501(6)(b) (2011).
18 Mr. Miles essentially argued that the four factors in subsection 501(6)(b) are the only relevant considerations in deeming a knife to be a dangerous weapon. See Miles, 2013 UT App 77, ¶ 12, 299 P.3d 1163. He therefore argued that since the second and third factors either implicitly or explicitly require actual use of the knife, "a person is guilty of possessing a dangerous weapon only if he in fact uses it." Id. He asserted this conclusion followed logically from the inclusion of "a knife" in subsection (b) as an item "not commonly known as a dangerous weapon." Utah Code § 76-10-501(6)(b) (2011). The court of appeals, however, held this interpretation to be out of harmony with related statutory provisions. Miles, 2013 UT App 77, ¶¶ 13-15, 299 P.3d 1163. First, the court concluded that Mr. Miles's proposed interpretation of subsection 501(6)(b) did not accord with the language of its companion subsection 501(6)(a), which references an object's "intended use." Id. ¶13. This reference to intended use "clearly signal[ed]" to the court of appeals that "an item may qualify as a dangerous weapon even if it is not actually used as one." Id. Second, the court pointed out that adopting Mr. Miles's interpretation requiring actual use would nullify the "possession" variant of the criminal offense in section 76-10-503, which forbids not only use, but also purchase, transfer, possession, custody, or control of a dangerous weapon by a restricted person. Id. ¶14. Accordingly, the court held that a knife or other object not commonly known as a dangerous weapon need not "actually be used" to qualify as a dangerous weapon under the statute. Id. ¶ 15.
*216 T9 The court next addressed, in light of its interpretation of the statute, whether Salt Lake City presented sufficient evidence from which the jury could reasonably conclude that Mr. Miles's knife was a dangerous weapon. Id. ¶¶16-20. After analyzing the available evidence on each of the four factors, and viewing that evidence in a light most favorable to the jury's verdict, the court held that "reasonable minds could ... have reached the conclusion that [Mr.] Miles's knife was a dangerous weapon" and affirmed the verdict. Id. ¶21 (internal quotation marks omitted). In doing so, the court relied heavily on Mr. Miles's alleged threats as evidence that Mr. Miles intended to use the knife as a dangerous weapon. [Id. We granted certiorari to determine whether the court of appeals erred in holding there was sufficient evidence to support Mr. Miles's conviction for possession of a dangerous weapon as defined in subsection 501(6).
STANDARD OF REVIEW
¶ 10 On certiorari, "we review the decision of the court of appeals and not that of the district court." State v. Hansen, 2002 UT 125, ¶ 25, 63 P.3d 650 (internal quotation marks omitted). The court of appeals' decision interprets Utah Code section 76-10-501(6) and evaluates the sufficiency of the evidence supporting Mr. Miles's conviction. We review the court of appeals' statutory interpretation for correctness, giving no deference to its legal conclusions. Stephens v. Bonneville Travel, Inc., 935 P.2d 518, 519 (Utah 1997). Whether the evidence presented at trial is sufficient to support the verdict is likewise a question of law, which we review for correctness. In reviewing the sufficiency of evidence, however, we "do[ ] not sit as a second fact finder." State v. Warden, 813 P.2d 1146, 1150 (Utah 1991). Instead, our review "is limited to insuring that there is sufficient competent evidence regarding each element of the charge to enable a jury to find, beyond a reasonable doubt, that the defendant committed the crime." Id. This review requires the evidence and all reasonable inferences that may be drawn therefrom to be viewed "in the light most favorable to the jury verdict." Id. Because a sufficiency of the evidence inquiry ends "if there is some evidence ... from which findings of all the requisite elements of the crime can reasonably be made," State v. Butt, 2012 UT 34, ¶ 24, 284 P.3d 605 (internal quotation marks omitted), we will overturn a conviction only if the evidence "is so inconclusive or inherently improbable that a jury must have entertained a reasonable doubt as to the defendant's guilt." Warden, 813 P.2d at 1150.
ANALYSIS
¶ 11 Mr. Miles contends that the court of appeals erred both in interpreting and applying section 76-10-501(6) of the Utah Code, which defines "dangerous weapon" as used in the statute under which Mr. Miles was con-viected. We first address Mr. Miles's statutory interpretation arguments. We then turn to whether the court of appeals erred in concluding that the evidence was sufficient to support the jury's verdict.
I. THE FACTORS IN SUBSECTION 76-10-501(6)(b) ARE THE EXCLUSIVE DEFINITIONAL CONSIDERATIONS FOR KNIVES OR OTHER ITEMS NOT COMMONLY KNOWN AS DANGEROUS WEAPONS
¶ 12 Mr. Miles argues that the court of appeals incorrectly construed the statute to permit a jury to consider a knife's intended use in making the dangerous weapon determination. The court of appeals held that a knife's intended use may be considered because subsection 501(6)(a) references "intended use" in defining the term dangerous weapon. Utah Code § 76-10-501(6)(a) (2011). Mr. Miles, however, argues that when the item in question is a "knife, or another item ... not commonly known as a dangerous weapon," id. § 76-10-501(6)(b) (2011), the only considerations relevant to that determination are the four factors enumerated in subsection 501(6)(b). And because those factors speak only in terms of a knife's actual use,[3] Mr. Miles argues evi *217 dence of the knife's infended use may not support a verdict that the knife was a dangerous weapon.
¶ 13 When interpreting a statute, "we look first to the statute's plain language to determine its meaning." Sindt v. Ret. Bd., 2007 UT 16, ¶ 8, 157 P.3d 797 (internal quotation marks omitted). plain language of a statute is to be read as a whole, and its provisions interpreted in harmony with other provisions in the same statute and with other statutes under the same ... chapter[ ]." Duke v. Graham, 2007 UT 31, ¶ 16, 158 P.3d 540 (alteration in original) (internal quotation marks omitted).
{14 As noted, subsection 76-10-501(6) states that the term dangerous weapon "means an item that in the manner of its use or intended use is capable of causing death or serious bodily injury." If we were to read this sentence in isolation, we would agree with the court of appeals that its terms appear to apply to any item capable of causing death or serious bodily injury, whether that item is one that is commonly known as a dangerous weapon-like a grenade or sword-or one that is not-like a shovel, baseball bat, or serewdriver. The second subpart of this statute, however, qualifies this language by stating that "in determining whether a knife, or another item, object, or thing not commonly known as a dangerous weapon is a dangerous weapon," four enumerated factors "shall be used." Utah Code § 76-10-501(6)(b) (2011) (emphasis added). "Implicit in this second sentence are two separate categories: (1) items commonly known as dangerous weapons; and (2) items not commonly known as dangerous weapons but included if, in considering the ... enunciated [factors], they qualify." State v. Archambeau, 820 P.2d 920, 929 (Utah Ct.App.1991). When read together with subsection (a), the language of subsection (b) indicates that each subpart of this section provides a separate and comprehensive definitional standard applicable to these two separate categories of objects. Subsection (a) applies to, and categorically includes in its definition, those objects commonly known as dangerous weapons-Le., those items that are designed, produced, and commonly used or intended to be used primarily to cause death or serious bodily injury. Subsection (b), on the other hand, provides a separate standard that applies to objects that are "not commonly known as ... dangerous weapon[s]," specifically mentioning knives, and requires consideration of four enumerated factors in determining whether knives are dangerous weapons.
115 Stated concisely, if an item is commonly known as a dangerous weapon because it is generally understood to be an item whose "use or intended use" is the infliction of grave bodily injury or death, it qualifies as a dangerous weapon under subsection 501(6)(a); but if an item is "not commonly known as a dangerous weapon" because it is an object whose primary utility is something other than its capability to inflict serious bodily injury or death, the statute requires application of a four-factor test to determine if the item qualifies as a dangerous weapon.
{16 This interpretation is supported by the structure of section 76-10-501(6) and its surrounding provisions. Although subsection (a) might appear at first blush to be a universally applicable definition of "dangerous weapon," we find this interpretation inconsistent with the structure of the statute. If subsection (a) were to apply, as the court of appeals held, to any object "that in the manner of its use or intended use is capable of causing death or serious bodily injury"-including items not commonly known as dangerous weapons-consideration of at least two of the four factors in subsection (b) would be unnecessary and duplicative. Indeed, consideration of the first factor-the instrument's character-would be duplicative of subsection (a)'s consideration of the object's "use or intended use," which, as de-seribed above, goes to the object's commonly understood nature as a dangerous weapon. And the fourth factor-the "other lawful purposes for which the instrument ... may be used"-is simply the converse of subsection (a)s consideration of whether the object's primary utility is its capability to inflict serious bodily injury or death. This significant *218 redundancy suggests that the purpose of subsection (b) is not to list factors that merely inform subsection (a)'s definition, but rather to provide a separate and comprehensive set of definitional considerations applicable to items that do not fall within the ambit of subsection (a)-ie., to knives and other items not commonly known as dangerous weapons.
{17 Furthermore, we disagree with the court of appeals' suggestion that this interpretation of the statute would "nullify [the 'possession'] variant of the offense" in subsection 76-10-503(3).[4] Salt Lake City v. Miles, 2013 UT App 77, ¶ 14, 299 P.3d 1163. The court of appeals concluded that an interpretation that failed to consider an item's "intended use" under subsection (a), and instead focused exclusively on the four factors in subsection (b)-which speak only of the item's actual use-would read out of section 76-10-503(3) the crime of possessing a dangerous weapon. See id.
1 18 The interpretation we espouse today, however, does not categorically eliminate the possession variant of this offense because objects commonly known as dangerous weapons fall squarely within the statute's definition of dangerous weapon under subsection (a). Thus, for example, if a Category II restricted person possessed an item commonly known as a dangerous weapon (for instance, a grenade), that person could face prosecution under subsection 5088) for possession of a dangerous weapon, as a grenade falls squarely within the definition of dangerous weapon under subsection 501(6)(a). It is only when the item in question is not commonly known as a dangerous weapon (for example, a knitting needle or a crowbar) that the focus shifts exclusively to the character of the instrument, the character of wounds it produced, if any, the manner in which it was used, and the other lawful uses for which it may be used. And under these factors, even in the absence of use, it still may be possible for such an item to exhibit such an abundance of weapon-like characteristics and be substantially devoid of other lawful uses, that it may appropriately be deemed a dangerous weapon, the possession of which would be unlawful under Utah Code section 76-10-503(8).
¶ 19 Finally, we note that for items not commonly known as dangerous weapons, the statutory shift in focus to these four factors, which emphasize the manner in which the object is actually used, is justified because such items are primarily intended to be used for purposes other than "causing death or serious bodily injury." Utah Code § 76-10-501(6)(a) (2011).[5] Thus, the intended use of these items does not establish their nature as a dangerous weapon. But an inquiry into how the item was actually used and the wound it actually produced, together with an analysis of the item's character, could demonstrate quite clearly its nature as a dangerous weapon.[6] Accordingly, "in determining whether a knife, or another item, object, or thing not commonly known as a dangerous weapon is a dangerous weapon," id. § 76-10-501(6)(b) (2011), evidence of the use to which the defendant intended to put the object is not to be considered by the fact finder.
II. SALT LAKE CITY FAILED TO PROVIDE SUFFICIENT EVIDENCE UPON WHICH THE JURY COULD CONCLUDE THAT MR. MILES KNIFE WAS A DANGEROUS WEAPON UNDER SECTION 76-10-501(6)
¶ 20 We now turn to the question of whether the evidence presented at trial is sufficient to sustain the jury's verdict that Mr. Miles's knife was a dangerous weapon under the statute. Having determined that the four factors in subsection 76-10-501(6)(b) *219 are the exclusive considerations to be addressed when determining whether a "knife ... is a dangerous weapon," we now examine the sufficiency of the evidence presented on each statutory factor in subsection 501(6)(b).
§21 The first factor is "the character of the instrument, object, or thing." Utah Code § 76-10-501(6)(b)(i) (2011). In marshaling the record evidence supporting the jury's verdict on this factor, the court of appeals noted the following characteristics of the knife: its three-and-a-half inch blade, its handle of approximately the same length, the blade's serrated portion, and the thumb stud located on the blade for ease of deployment. Salt Lake City v. Miles, 2013 UT App 77, ¶ 17, 299 P.3d 1163. In summarizing the way in which this evidence supported the dangerous weapon determination, the court noted that the blade "could be flipped open with one hand and was capable of inflicting serious, even deadly, wounds." Id. ¶21. We hold, however, that this evidence cannot weigh in favor of the jury's verdict because these facts simply recite general characteristics common to many, if not most, pocketknives; and knives-under the statute-are explicitly listed as items "not commonly known as ... dangerous weapon[s]." See Utah Code § 76-10-501(6)(b) (2011) (emphasis added).
1 22 This first statutory factor does not call upon the jury to consider the general characteristics of the knife in a vacuum, but rather to consider the character of the knife as a dangerous weapon. "Character" is defined, in relation to an object's characteristics, as the "individual composite of salient traits, consequential characteristics, [and] features giving distinctive tone." Webster's Third New INTERNATIONAL Dictronary 376 (2002). It is similarly defined as the "essentials of structure, form, materials, or function that together make up and usu[ally] distinguish" the object in question from one of a different category. Id. The purpose of this statutory factor is to distinguish ordinary knives, those not commonly known as dangerous weapons, from knives that are in fact dangerous weapons. Therefore, when assessing the "character" of the knife, the focus is on the knife's "individual composite of salient traits, consequential characteristics, [and] features giving [the knife the] distinctive tone" of a dangerous weapon. For a knife's characteristics to weigh in favor of Salt Lake City under this factor, they must be those that go beyond attributes common to knives that make them useful as tools, e.g., their sharpness, cutting ability, or safety mechanisms; they must be features that help to distinguish the knife in question from the presumptive category of common, tool-like knives and demonstrate a character consistent with the statutory category of dangerous weapons.
123 None of the general characteristics recited by the court of appeals, individually or in the aggregate, give Mr. Miles's knife the distinctive tone of a dangerous weapon. The knife's three-and-a-half inch blade is nothing out of the ordinary for common utility knives; in fact, a blade much shorter than that would have substantially limited utility. And the presence of a small serrated portion on the blade is also not an inherent marker of a dangerous weapon. Indeed, average steak knives feature a blade of at least that length and a fully serrated blade. These features alone do not give a knife the "dis-tinetive tone" of a dangerous weapon.
1 24 The thumb stud on the knife's blade likewise does not distinguish this pocketknife as a dangerous weapon. Salt Lake City argues the thumb stud is inherently weapon-like because it allows the user to open the knife with one hand in the event the user wishes to deploy it as a weapon. But the thumb stud offers the same convenience if the user wishes to deploy the blade as a tool. Accordingly, this feature is at best ambiguous, and is certainly not an inherently distinctive feature of knives that are dangerous weapons. We therefore hold that the evidence considered by the court of appeals and available to the jury on this factor cannot, as a matter of law, weigh in favor of categorizing Mr. Miles's knife as a dangerous weapon.
125 The second factor is "the character of the wound produced, if any." UTaK Cop® § 76-10-501(6)(b)(ii) (2011) (emphasis added). Only those wounds actually produced by the knife may be appropriately considered under this factor. The court of appeals acknowledged that "no wound was in *220 fact produced" in this case. Miles, 2013 UT App 77, ¶ 18, 299 P.3d 1163. That should have been the end of the court's analysis. But the court went on to consider the officer's testimony of the wounds the knife could inflict if it were used as a weapon, including causing "puncture and slashing wounds," an exaggerated wound profile due to the serrated edge, and infliction of "permanent disfigurement or even death." Id. This was error. Evidence presented under this factor is relevant only if it is evidence of wounds actually produced by the knife in question. Because Mr. Miles's knife inflicted no wounds, this factor must weigh against a finding that the knife was a dangerous weapon.
¶ 26 The third factor is "the manner in which the instrument, object, or thing was used." Utah Code § 76-10-501(6)(b)(iii) (2011) (emphasis added). Just like the see-ond factor, this one is applicable only when the knife is actually used. Once again, the court of appeals acknowledged that Mr. Miles "did not physically use the knife." Miles, 2013 UT App 77, ¶ 19, 299 P.3d 1163. Yet the court continued its analysis of this factor, considering evidence that the knife was "within reach in the pocket of [Mr. Miles's] jacket in a nearby shopping cart," and that Mr. Miles had "framed" the knife as a weapon by threatening the supervisor. Id. This, too, was error. The jury may consider evidence under this factor only if it demonstrates the manner in which the knife "was used." Uran Cope § 76-10-501(6)(b)@i) {emphasis added). Physical use is the touchstone of this factor's analysis. We therefore reject the court of appeals' implication that Mr. Miles "used" the knife by "framing" it as a weapon with his threats. Even assuming Mr. Miles was referencing this knife in making his threats, a verbal reference to an object does not constitute "use" of that object under this statutory factor. The court of appeals therefore erred in its analysis of this factor by considering evidence that had no bearing on how the knife was actually used. Indeed, as the court of appeals stated, the knife here was not used at all.
127 Finally, the fourth factor is "the other lawful purposes for which the instrument, object, or thing may be used." Utah Code § 76-10-501(6)(b)(iv) (2011) {emphasis added). The statute's use of the word "may" in this factor indicates that evidence presented on this point need only demonstrate that the knife is capable of lawful uses. The court of appeals noted the evidence presented on this factor, specifically Mr. Miles's statement that he used the knife for camping. Miles, 2013 UT App 77, ¶ 20, 299 P.3d 1163. The court agreed that the knife is "obviously well suited for camping and other innocent uses" as demonstrated by the officer's testimony at trial. Id. All of the evidence presented on this factor clearly weighed against a determination that Mr. Miles's knife was a dangerous weapon.
28 After review of the evidence presented under each of the four enumerated factors in section 76-10-501(6)(b), we conclude that none of the evidence supports Salt Lake City's position that Mr. Miles's knife is a dangerous weapon under the statute. The evidence presented on the first factor did not demonstrate, nor did it give rise to a reasonable inference, that Mr. Miles's knife bore the character of a dangerous weapon as evidenced by any inherent and uniquely weapon-like traits. Additionally, because Mr. Miles's knife was not used and did not produce any wounds, Salt Lake City necessarily failed to present the jury with evidence supporting its position on the second and third factors. And finally, the evidence presented on the fourth factor-the knife's other lawful uses-clearly weighed in favor of Mr. Miles. Accordingly, we conclude that the evidence presented at trial was insufficient to sustain Mr. Miles's conviction of possession of a dangerous weapon as defined in section 76-10-501(6).
129 We therefore reverse the court of appeals and vacate Mr. Miles's conviction.

. This statute has been substantially amended since Mr. Miles's conviction. See 2014 Utah Laws 2255-58(amending, among other provisions, Uras Cope §§ 76-10-501, -503). Our analysis, however, is governed by the 2011 version of the statute because the 2011 version was in place at the time of Mr. Miles's alleged criminal conduct. See State v. Clark, 2011 UT 23, ¶ 14, 251 P.3d 829 (noting that a party's "primary rights and duties are dictated by the law in effect at the time of ... the conduct giving rise to a criminal charge"). We accordingly reference the 2011 version throughout this opinion.

. Evidence presented at trial demonstrated that Mr. Miles was a Category II restricted person due to a prior felony conviction. See Utah Code §

. Utah Code § 76-10-501(6)(b)(ii) (2011) ("the character of the wound produced, if any" (emphasis added)); id. § 76-10-501(6)(b)(iii) (2011) *217 ("'the manner in which the instrument, object, or thing was used" (emphasis added)).

. Urax Cope § 76-10-503(3) (2011) ("A Category II restricted person who purchases, transfers, possesses, uses, or has under his custody or control: ... (b) any dangerous weapon other than a firearm is guilty of a class A misdemean- or.").

. It is perhaps true that an item not commonly known as a dangerous weapon may have multiple purposes, one of which might arguably be to cause death or serious bodily injury. But this fact only underscores the point that "intended use" is inapposite, and therefore the determinative consideration regarding this item's use is not its intended use (for there may be several), but the way in which it was actually used.

. Examples abound: a baseball bat, a candlestick, a metal pipe, a ballpoint pen, etc.